MINNESOTA CENTER FOR EN-
VIRONMENTAL ADVOCA-
CY, Respondent,

v.

MINNESOTA POLLUTION CONTROL
AGENCY, Petitioner, Appellant,

Boise Cascade Corporation, Intervenor,
Petitioner, Appellant.

No. C6–01–96.

Supreme Court of Minnesota.

May 23, 2002.

Mike Hatch, Minnesota Attorney General, Eldon G. Kaul (# 54070), Leah M.P. Hedman (# 280501), St. Paul, MN, for Appellant MPCA.

Winthrop & Weinstine, P.A., Lloyd W. Grooms (# 188694), Eric F. Swanson (# 188128), St. Paul, MN, for Appellant Boise Cascade.

Faegre & Benson LLP, Brian B. O'Neill (# 82521), Richard A. Duncan (# 192983), Kristin R. Eads (# 275414), Elizabeth H. Schmiesing (# 229258), Anne E. Mahle (# 312861), Minneapolis, MN, for Respondent MCEA.

Dunkley, Bennett, Christensen & Madigan, P.A., Michael D. Madigan (# 129586), David G. Parry (# 281980), Minneapolis, MN, for Amicus Trout Unlimited, et al.

David R. Oberstar (# 144162), Duluth, MN, for Amicus MN Timber.

## OPINION

GILBERT, Justice.

Respondent Minnesota Center for Environmental Advocacy (MCEA) brought a declaratory judgment action in district court seeking an order requiring the preparation of an Environmental Impact Statement (EIS), pursuant to Minn.Stat. § 116D.04, subd. 2(a) (2000), on Appellant Boise Cascade Corporation's proposed Efficiency Improvement Project.[1] Appellant Minnesota Pollution Control Agency (MPCA), as the responsible governmental unit (RGU), concluded that the proposed project did not have the potential for significant environmental effects and therefore an EIS was not required. The district court granted summary judgment to the MPCA, holding there was substantial evidence in the record to support the MPCA's decision not to require an EIS. The Minnesota Court of Appeals reversed the district court and remanded to the MPCA for the preparation of an EIS. We reverse the court of appeals.

Boise Cascade operates an integrated pulp and paper mill on the Rainy River in International Falls, Minnesota. The mill manufactures a variety of coated and uncoated fine paper products. Wood for the mill is supplied from Boise Cascade's timberlands in Minnesota, public and private timberlands, and residues from local sawmills. Boise Cascade supplies 72 percent of the wood for the mill and purchases the remainder on the outside market in the form of pulp. Currently, the mill consumes approximately 600,000 cords[2] of wood per year.

Because the mill is not completely integrated and must purchase part of its pulp requirements, Boise Cascade has proposed an efficiency improvement project to make the mill less dependent on pulp purchased on the outside market. The improvements would increase the mill's maximum wood consumption by up to 100,000 cords per year, bringing the total consumption to approximately 700,000 cords per year. This wood is expected to be harvested from an area within a 150–mile radius of International Falls, but some may come from farther away.

The MPCA was required by law to complete an environmental assessment

---

1. The MCEA is a nonprofit public interest group dedicated to responsible use of the law, science, and research to protect Minnesota's natural resources, wildlife, and the health of its people.

2. A cord of wood is a stack of wood 4 feet wide, 4 feet high, and 8 feet long. *Webster's New International Dictionary of the English Language* 590 (2d ed.1937).

worksheet (EAW)[3] for the proposed improvement project.[4] Because some issues surrounding the project involved management of the state's forest resources, the MPCA requested the Minnesota Department of Natural Resources (DNR) to assist in preparation of the EAW. The legislature has designated the DNR as the appropriate agency to monitor and evaluate the trends, conditions, and other governmental interagency information under the Sustainable Forest Resources Act (SFRA). *See* Minn.Stat. §§ 89A.01, subds. 4, 6 (2000); 89A.07, subd. 1 (2000); 89A.09, subd. 1 (2000).

The DNR noted that the proposed project represents a maximum 2.5 percent increase in statewide harvest levels. The timber procurement area consists of approximately 11,400,000 acres of timberland and the project will increase timber harvests by an estimated range of 2,500—6,000 acres in this base disbursed across the 150-mile wide procurement zone.

The DNR also assisted by contributing to the part of the EAW that addressed environmental impacts related to the increase in timber harvesting. The DNR relied in part upon the timber harvest and

forest management guidelines promulgated by the Minnesota Forest Resources Council (MFRC) under the SFRA. In the DNR's analysis of the potential environmental impacts, it also relied upon the 1994 Generic Environmental Impact Statement for Timber Harvesting and Forest Management (Forestry GEIS).[5] The Forestry GEIS was prepared at the request of the Minnesota Environmental Quality Board (EQB) to examine the effect that expanded timber harvesting might have on the environment. Here, the EQB determined that the Forestry GEIS remained adequate for use in the analysis of Boise Cascade's project.

The EAW was completed and distributed for public comment on February 19, 1999. A comment and response period followed, during which the MPCA and the DNR received comments from the MCEA and others regarding the need for an EIS and specifically responded to those comments. *See* Minn.Stat. § 116D.04, subd. 2a(b) (2000). At the completion of this comment period, the MPCA concluded that the proposed project did not have the potential for significant environmental ef-

3. The EAW is a brief document (here, well over 100 pages) that is designed to rapidly assess the environmental effects that may be associated with a proposed project. Minn. R. 4410.1000, subp. 1. Information gathered during the EAW process and the comments received on the EAW are to be used by an agency to make the ultimate decision whether to engage in a more detailed environmental review and prepare an environmental impact statement (EIS) on the project. Minn.Stat. § 116D.04, subd. 1a(c) (2000); Minn. R. 4410.1700.

4. The requirement to prepare an EAW was not triggered by the timber harvesting issues central to this case; instead, the requirement was triggered because the project involved modification of a facility with an increase in air pollution. *See* Minn. R. 4410.4300, subp. 15(A).

5. A generic environmental impact statement (GEIS) is used to study types of projects that are not adequately reviewed on a case-by-case basis. Minn. R. 4410.3800, subp. 1. However, preparation of a GEIS does not exempt specific projects from project-specific environmental review. *Id.*, subp. 8. Additionally, a GEIS may not be used in project-specific environmental review unless the Minnesota Environmental Quality Board (EQB) determines that the generic EIS remains adequate at the time the specific project is subject to review. *Id.* Here, EQB determined that the Forestry GEIS remained adequate, but only if it was "used, interpreted, and qualified properly in project-specific review." The MCEA did not timely appeal this determination of adequacy.

fects and that preparation of an EIS was not required.[6] *See* Minn.Stat. § 116D.04, subd. 2b(2). The MPCA made several important findings and conclusions in support of its decision, including the following:

[C]5. The MPCA finds that the potential environmental effects of the project are subject to mitigation by ongoing public regulatory authority.

\* \* \* \*

[D]4. The MPCA finds that the environmental effects of the project can be anticipated and controlled as a result of the previous environmental review, previous environmental studies, and permitting processes undertaken by the MPCA and other public agencies or the project proposer, including other EISs.

\* \* \* \*

### CONCLUSIONS

\* \* \* \*

2. Areas where the potential for significant environmental effects may have existed have been identified and appropriate mitigative measures have been incorporated into the project design and proposed permits. The project is expected to comply with all MPCA standards.

3. An Environmental Impact Statement is not required on the proposed Boise Cascade Efficiency Improvement Project.

The MCEA then initiated an action in district court against the MPCA for declaratory and injunctive relief, challenging the MPCA's decision not to require an EIS under Minn.Stat. § 116D.04, subd. 10 (2000). Boise Cascade intervened and was joined as a party defendant. The MCEA argued that the MPCA unlawfully relied upon (1) the Forestry GEIS as a substitute for project-specific review and (2) unimplemented and outdated mitigation measures, including the ongoing implementation of programmatic mitigation under the SFRA.

The parties brought cross-motions for summary judgment, and the district court granted summary judgment in favor of Boise Cascade and the MPCA and against the MCEA. The court noted the undisputed facts, including that the MPCA was the RGU for this project, and that the MPCA had enlisted the aid of the DNR's forestry expertise. The court then addressed each issue raised by the MCEA. First, the court ruled that the issues raised regarding the Forestry GEIS were essentially the same issues that the MCEA raised before the EQB when it originally challenged the adequacy of the Forestry GEIS before the EQB. Because the MCEA did not timely appeal the EQB's determination of adequacy, the court ruled that it was not required to address the issue. However, the court went on to find that the MPCA did use the Forestry GEIS properly because the MPCA did not use the Forestry GEIS as a substitute for environmental review of the project and because a comprehensive EAW was prepared in which the Forestry GEIS was used in accordance with state regulations.

Second, addressing the adequacy of mitigation issue raised by the MCEA, the court ruled that there was "substantial support in the record that the mitigation

---

6. On February 17, 2000 MCEA petitioned the MPCA for a contested case hearing. The MPCA denied the petition. The district court analyzed the MPCA's decision not to hold a hearing under Minn. R. 7000.1750 and concluded that this denial was proper because it was not arbitrary or capricious and had substantial support in the record. The MCEA has not appealed from the district court's determination on this issue.

measures identified and relied upon are real, and are more than vague statements of good intentions." (Internal punctuation and citations omitted). Further, the court approved the MPCA's finding that:

> the progress of implementing [the SFRA] and other ongoing activities of forest landowners and managers, which represents the State's primary policy tool for addressing the cumulative environmental effects of timber harvest, [was] sufficient to provide ongoing mitigation for any cumulative potential effects that are present consistent with the findings and recommendations of the [Forestry] GEIS.

The court ruled that this finding was not arbitrary and capricious.

The court concluded by ruling that substantial evidence in the record supported the MPCA's conclusions. Specifically, the court ruled that, because decisions of administrative agencies generally enjoy a presumption of correctness, the MCEA had not demonstrated that the MPCA's decision was unreasonable, arbitrary and capricious, or lacked a factual basis.

The MCEA appealed. The court of appeals concluded that while some mitigation strategies were being identified and implemented, the MPCA's determination that the potentially adverse environmental effects of the Boise Cascade project were subject to mitigation by ongoing public regulatory authority was not supported by substantial evidence. Specifically, the court concluded that "[t]he efficacy of the mitigation measures for the Boise project was questionable" because (1) some of the measures were only monitored; (2) there were inaccuracies in the GEIS; (3) some of the conclusions in the GEIS were out-

dated; and (4) none of the measures were mandatory. Additionally, the court concluded that the MFRC did not "truly perform a regulatory function" and that "[w]ithout some assurances that mitigation measures can be compelled, even good-faith intentions can have an evanescent quality * * *." It further reasoned, "[t]he record here shows that some mitigation measures have been implemented, but it does not show that other, seemingly important, measures have gotten beyond the guidelines or strategizing stage." Thus, the court of appeals reversed the district court and remanded to the MPCA for preparation of an EIS. We granted Boise Cascade's and the MPCA's petition for further review of the decision of the court of appeals.

### Minnesota Environmental Law Background

Central to this case is the Minnesota Environmental Policy Act (MEPA), which requires that an EIS be prepared by the RGU whenever there is the potential for significant environmental effects resulting from any major governmental[7] action. Minn.Stat. § 116D.04, subd. 2a (2000). The purpose of an EIS is to provide information to evaluate proposed actions that have the potential for significant environmental effects, to consider alternatives to the proposed actions, and to explore methods for reducing adverse environmental effects. Minn. R. 4410.2000, subp. 1.

The Environmental Quality Board has promulgated rules setting forth the criteria that must be considered by the RGU when deciding whether a project has the potential for significant environmental effects and whether preparation of an EIS is

---

7. The major governmental action at issue in this case is the MPCA's amendment and re-issuance of air operating permits for Boise Cascade. The alteration of these permits is necessary because the project involves changes in the emission of air pollution by Boise Cascade's facility.

required. Minn. R. 4410.1700, subp. 7. Each of the following four criteria must be considered:

A. type, extent, and reversibility of environmental effects;

B. cumulative potential effects of related or anticipated future projects;

C. the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority; and

D. the extent to which environmental effects can be anticipated and controlled as a result of other available environmental studies undertaken by public agencies or the project proposer, including other EISs.

*Id.*

An EIS is meant to be prepared on a project-specific basis, but the EQB rules allow a generic environmental impact statement (GEIS) to be prepared to study the potential impacts of similar projects taken as a whole. Minn. R. 4410.3800. However, the EQB has placed restrictions on the use of information taken from the GEIS. When an agency conducts a project-specific environmental review, Minn. R. 4410.3800, subp. 8, mandates that the information gathered and the recommendations made in the GEIS process are to be used only if the EQB determines that the GEIS remains adequate at the time the specific project is subject to review.

Here, in response to citizens' petition concerning the impact of timber harvesting in Minnesota, the EQB began preparation of the Forestry GEIS in 1989 and completed it in 1994. The Forestry GEIS assessed environmental impacts related to increases in timber harvesting and recom-

mended mitigation strategies to address those impacts identified as significantly adverse. In response to the Forestry GEIS, the Minnesota legislature created the Sustainable Forest Resources Act. Act of May 24, 1995, ch. 220, § 78–87, 1995 Minn. Laws 1645–53, now codified at Minn.Stat. Ch. 89A (2000). The SFRA created the Minnesota Forest Resources Council and charged the MFRC with developing recommendations that address the environmental impacts and the mitigations as recommended in the Forestry GEIS. Minn. Stat. § 89A.03 (2000). The MFRC was directed to develop voluntary comprehensive timber harvesting and forest management guidelines. Minn.Stat. § 89A.05, subds. 1, 3 (2000). These voluntary guidelines are central to the parties' dispute in this case. Specifically, the MPCA argues that the EQB rules do not require that "mitigation by ongoing public regulatory authority" must be mandatory to satisfy Minn. R. 4410.1700, subp. 7(C).

## I.

■■■ "[D]ecisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977). Since *Reserve Mining,* the legislature has codified the standard of review for agency's decisions in contested case proceedings in the Minnesota Administrative Procedures Act (MAPA) at Minn.Stat. § 14.69 (2000). However, the MPCA's decision was not the result of a contested case [8] and the ques-

---

8. A contested case is defined by MAPA as a "proceeding before an agency in which the legal rights, duties, or privileges of specific parties are required by law or constitutional right to be determined after an agency hear-

ing." Minn.Stat. § 14.02, subd. 3 (2000). Here, MPCA's decision not to require an EIS was not a contested case within the meaning of the MAPA because no hearing was required

tion arises whether the MAPA standards of review should nonetheless apply. In *Reserve Mining*, we began our analysis with the bedrock separation of powers principle that the legislature may not delegate to the courts "duties which are essentially administrative in character." 256 N.W.2d at 824. We also believe that in an area such as environmental review, uniquely involving application of an agency's expertise, technical training, and experience, the standard of review set forth in MAPA is appropriate. Therefore, despite the fact that a contested case proceeding was not held in this case, we believe application of the MAPA standards is appropriate. *See* Minn.Stat. § 14.69.

One of the MAPA standards of review is whether the agency's decision is affected by error of law, and the MCEA argues that the decision not to prepare an EIS is contrary to law. The MCEA further argues that because the issue presented requires interpretation of the MEPA and the EQB rules implementing that statute, review by this court is de novo. *See St. Otto's Home v. Minn. Dep't of Human Servs.*, 437 N.W.2d 35, 39 (Minn.1989). Here, the statute requires an EIS if Boise Cascade's project will result in "significant environmental effects." Minn.Stat. § 116D.04, subd. 2a. A determination whether significant environmental effects result from this project is primarily factual and necessarily requires application of the agency's technical knowledge and expertise to the facts presented. Accordingly, it is appropriate to defer to the agency's interpretation of whether the statutory standard is met. Thus, in light of the MCEA's remaining arguments, we review the decision not to prepare an EIS for whether it was unsupported by substantial evidence in view of the entire record as

and the only "party" involved in the original

submitted or was arbitrary or capricious. *See* Minn.Stat. § 14.69.

■ A decision is supported by substantial evidence when it is supported by (1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than some evidence; (4) more than any evidence; or (5) the evidence considered in its entirety. *Cable Communications Bd. v. Nor–West Cable Communications P'ship*, 356 N.W.2d 658, 668 (Minn.1984).

## II.

The MCEA makes several related arguments regarding the MPCA's decision not to require an EIS for the Boise Cascade project. For purposes of our analysis, these arguments will be organized into two categories. First, the MCEA argues that we should affirm the court of appeals because the MPCA's use of the Forestry GEIS was improper. Second, the MCEA argues that we should affirm because the voluntary timber management guidelines relied upon by the MPCA cannot be legally adequate mitigation.

### A. Use of the GEIS

■ The MCEA makes two arguments regarding the MPCA's use of the Forestry GEIS and the ramifications of its use. Specifically, the MCEA argues that, under the EQB rules, the MPCA failed to conduct additional analysis necessary to justify reliance on the Forestry GEIS. The MCEA also argues that because Boise Cascade's project falls into one of the scenarios studied in the Forestry GEIS and because that scenario resulted in significant environmental effects unless certain mitigation measures were in place, an EIS would be required by law.

decision was Boise Cascade.

We are not persuaded by the MCEA's arguments. "[T]he role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one * * *." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 555, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). We emphasize that the EQB specifically approved the Forestry GEIS for continued use in this project, concluding that the Forestry GEIS "remains adequate for use in accordance with Minn. R. 4410.3800, subp. 8 * * *." It is significant that the EQB thus interpreted the Forestry GEIS to address the EQB's criteria for an EIS as applied to this specific project. *See* Minn. R. 4410.1700, subp 7. We defer to an agency's interpretation of its own regulations. *St. Otto's Home,* 437 N.W.2d at 40. The MPCA has technical expertise regarding water, air, and land pollution. *See* Minn.Stat. § 116.01 (2000). Similarly, the DNR assisted the MPCA for several years and in this process has technical expertise with respect to timber and forestry. *See* Minn.Stat. § 84.027, subd. 2 (2000).

The DNR represented that the Forestry GEIS is the most comprehensive, scientific assessment of forest health procedures to date. Furthermore, in the DNR's comments and responses on timber harvest issues for the EAW, it indicated that Boise Cascade's project was of the type anticipated by the Forestry GEIS to come forward in the coming decades. The MPCA properly relied on the DNR's expertise and confidence in the Forestry GEIS in determining that no EIS was required. Therefore, under longstanding precedent and general principles of administrative law and based on this record, we will defer to the technical expertise of the MPCA and the DNR regarding the use and application of the Forestry GEIS. *Reserve Mining,* 256 N.W.2d at 824. Accordingly, we

hold that the MPCA and the DNR's use of the Forestry GEIS was not arbitrary or capricious.

### B. Mitigation

In making its decision whether to require an EIS, the MPCA was required by Minn.Stat. § 116D.04, subd. 2a, to determine whether the project had the potential for significant environmental effects. Minnesota Rules 4410.1700, subp. 7, required the MPCA to *consider* four criteria when making the decision whether there was the potential for significant environmental effect. The only criterion relevant on appeal is the third criterion, which requires the MPCA to consider "the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority." *Id.,* subp. 7(C). The MCEA does not dispute that the MPCA, as the RGU, appropriately took the other three criteria into consideration and does not appeal from those determinations. The other three criteria are (1) the type, extent, and reversibility of environmental effects; (2) the cumulative potential effects of related or anticipated future projects; and (3) the extent to which environmental effects can be anticipated and controlled as a result of other available environmental studies undertaken by public agencies or the project proposer, including other EISs. *Id.*

The MPCA addressed the mitigation criterion several times in its findings of fact and conclusions and specifically found that the "cumulative statewide effects of timber harvesting are subject to ongoing regulatory authority through the programmatic mitigation established by the Sustainable Forest Resources Act" and the guidelines developed by the MFRC. The MPCA then concluded that "the potential environmental effects of the project are subject to mitigation by ongoing public regulatory

authority." The MCEA attacks the MPCA's analysis of the mitigation criterion in two related arguments. First, the MCEA argues that the MFRC, as established under the SFRA, does not constitute a "public regulatory authority." Second, the MCEA argues that voluntary guidelines adopted under Minn.Stat. § 89A.05, subd. 3, cannot be considered mitigation because the MFRC lacks power to compel compliance with the guidelines.

In contrast, the MPCA argues that the court of appeals substituted its judgment for that of the MPCA and the DNR and that substantial evidence supports the MPCA's conclusions. We agree. While the court of appeals acknowledged that some mitigation measures have been identified and implemented, it found their "efficacy * * * questionable" unless there was some assurance that the mitigation measures could be compelled. The court also concluded that monitoring of the mitigation measures was substantially lacking. In so doing, the court of appeals weighed the evidence as a trier of fact instead of analyzing the issue properly under the supported by substantial evidence standard of review.

For the MPCA's decision to satisfy the MAPA's supported-by-substantial-evidence standard, its decision must be supported by either (1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than some evidence; (4) more than any evidence; or (5) the evidence considered in its entirety. *Cable Communications Bd.*, 356 N.W.2d at 668. Contrary to the arguments of the MCEA and the conclusion of the court of appeals, our review of the record indicates that there is such relevant evidence as a reasonable mind might accept as adequate to support the conclusion that the MPCA *did* consider, in sufficient detail, adequate

mitigation to ensure that the environmental consequences have been fairly evaluated. For example, the 36-page Appendix E of the EAW detailed an array of specific mitigation measures being undertaken. In addition, the record indicates that the DNR and the United States Forest Service (USFS), who own approximately one-third of all forested land in Minnesota, are actively implementing mitigation measures. The DNR has committed to meet or exceed the recommended site level guidelines in carrying out its forest management activities. Similarly, the USFS has developed certain policies for its lands to be maintained in a condition consistent with the GEIS assumptions. The EAW record also indicates that both Boise Cascade and the DNR are committed to applying the MFRC guidelines, at a minimum, to timber harvesting on land they own. The record also indicates application of similar measures on certain county and federal lands.

Further, the record reveals another important detail overlooked by the MCEA. Specifically, we note one of the final conclusions made by the MPCA in its findings of fact and conclusions: "Areas where the potential for significant environmental effects may have existed have been identified and appropriate mitigative measures have been incorporated into the *project design and proposed permits*. The project is expected to comply with all MPCA standards." (Emphasis added). The MPCA did not rely solely on compliance with the voluntary timber management guidelines as mitigation. Instead, the MPCA considered Boise Cascade's detailed commitment to the timber management guidelines on its land (Appendix F of the EAW included 24 measures undertaken by Boise Cascade to mitigate the environmental impacts of timber harvesting), the DNR's commitment to the guidelines on its land, as well as county and federal efforts on their land.

Additionally, in its decision not to require an EIS, the MPCA concluded that its "mitigative measures have been incorporated into the project design and *proposed permits.*" (Emphasis added.) Thus, it is irrelevant whether the MFRC is a public regulatory authority because the MPCA can, if necessary, enforce mitigative measures through its permitting function.

■ Here, Boise Cascade's project will require changes to two permits issued by the MPCA—an amendment to the Title V air operating permit as well as modification of a Prevention of Significant Deterioration permit.[9] Inclusion of some of the mitigative measures into the conditions of the permits means that the guidelines are not entirely voluntary but, together with the voluntary and ongoing measures, do provide substantial evidence to support the MPCA's finding that the potential environmental effects of the project are subject to mitigation by ongoing public regulatory authority. Importantly, MPCA is the official RGU for the environmental review of this project under Minn. R. 4410.4300, subp. 15A, and has full regulatory authority in its permitting decisions. Minn.Stat. § 116.07, subd. 4a(a). Notwithstanding the fact that the MFRC—the entity responsible for promulgation of the timber management guidelines—may lack any statutory or administrative enforcement mechanism or true regulatory authority, we conclude that the MPCA, as the RGU, does have the statutory authority to (1) prepare an EAW in the manner provided by law; (2) acknowledge and incorporate relevant MFRC guidelines, as well as other state policies and the agreements of the parties, into its fact finding determination whether an EIS is required; and (3) incorporate mitigation measures into its permits.

Thus, contrary to the court of appeals' conclusion, based on this record we conclude that there are assurances that reasonable mitigation measures will be in place when the permit is issued. Boise Cascade has agreed to utilize numerous mitigative measures on its own land and may ultimately be required by the permit conditions to ensure that its suppliers in Minnesota also utilize such mitigation measures. As such, the record supports the conclusion that the environmental effects of this proposed project are subject to both some voluntary and mandatory mitigation that will be in place before any increased harvesting is undertaken. *See National Audubon Soc. v. Minn. Pollution Control Agency,* 569 N.W.2d 211, 218 (Minn.App. 1997) (affirming summary judgment for the MPCA when it determined an EIS was not required based on Forestry GEIS mitigation measures), *rev. denied* (Minn. Dec. 16, 1997).

The parties' focus on the mandatory or voluntary nature of the mitigation measures is somewhat misleading when the

---

9. Congress amended the Clean Air Act in 1990 and created the Title V program, which prohibits major stationary sources of air pollution from operating either without a valid permit or in violation of the terms of a permit. *See* 42 U.S.C. §§ 7660–7661f (1994 & Supp. V 1999). The states administer and enforce the Title V permit program. 42 U.S.C. § 7661a(d)(1) (1994 & Supp. V 1999). States are allowed to establish additional permitting requirements above those required by federal law. 42 U.S.C. § 7661e(a) (1994 & Supp. V 1999).

Similarly, the Prevention of Significant Deterioration of Air Quality program is part of the Clean Air Act, but its emphasis is on ensuring that areas with levels of air pollution that exceed federal requirements remain clean and not degrade to bare compliance with federal standards. 42 U.S.C. §§ 7470–79 (1994 & Supp. V 1999); Craig N. Oren, *Prevention of Significant Deterioration: Control–Compelling Versus Site Shifting,* 74 Iowa L.Rev. 1, 3 (1988).

context of our review of the MPCA's decision is recalled. Here, we are reviewing the adequacy and factual foundation of the MPCA's decision not to require an EIS—the decision that Boise Cascade's project does not have the potential for significant environmental effects. Specifically, we are reviewing the MPCA's determination that the potential environmental effects of the project are subject to mitigation by ongoing public regulatory authority. In making this decision, the MPCA is required only to *consider* four criteria. Minn. R. 4410.1700, subp. 7. Of those four criteria, the MCEA challenges only the MPCA's analysis of one criterion—"[t]he extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority * * *." *Id.*, subp. 7(C). We are unable to find any requirement in our state's law that the MPCA cannot consider voluntary measures in assessing mitigation. In fact, "mitigation" is defined by the rules without mention of whether these measures must be mandatory or whether voluntary measures also constitute mitigation. *See* Minn. R. 4410.0200, subp. 51. Importantly, the mitigation measures most relevant to this case are the timber management guidelines promulgated by the MFRC under the SFRA. By statute, the legislature required that those guidelines were to be voluntary. Minn.Stat. § 89A.05, subd. 3.

We note that preparing an EAW, making the decision whether the EAW requires an EIS, and the ultimate preparation of an EIS are essentially an information gathering and analytical process. Minn.Stat. § 116D.04, subds. 1a(c), 2a. With respect to mitigation, we are persuaded by the reasoning of the United States Supreme Court when it discussed mitigation in a related context. The Supreme Court stated that "[p]ublication of an EIS * * * also serves a larger informational role. It gives the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process * * * and, perhaps more significantly, provides a springboard for public comment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (internal quotation marks and citations omitted). The National Environmental Policy Act of 1969 (NEPA) is similar to the MEPA in that both *primarily* operate by requiring administrative agencies to take a "hard look" at the environmental consequences of government action, without imposing substantive requirements.[10] The Court in *Robertson* held that NEPA did not mandate specific results but concluded that in regard to mitigation "[t]here is a fundamental distinction * * * between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other." *Robertson*, 490 U.S. at 352, 109 S.Ct. 1835.

■ Our review of an agency's decision is a limited one. Here, we must determine whether the MPCA's decision is supported by substantial evidence. The MPCA's decision is supported by substantial evidence if it is supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion. *Cable*

10. We note that the question whether the MEPA contains substantive protections above and beyond the procedural protections it shares with federal law is not before this court, and we will not address that issue here. Rather, we merely indicate that the procedural protections relevant to this case are similar to the federal protections found in NEPA and therefore looking to federal case law is appropriate and helpful in this case.

*Communications Bd.,* 356 N.W.2d at 668. Given the extensive record compiled in this case, the MPCA's findings on mitigation, its proposed permit conditions, and assurances from the DNR and Boise Cascade that they intend to require application of the guidelines on their land, we conclude that the MPCA's conclusion that "the potential environmental effects of the project are subject to mitigation by ongoing public regulatory authority" was supported by substantial evidence and not arbitrary or capricious. Therefore, we reverse the court of appeals and reinstate the order and judgment of the district court.

Reversed.

PAUL H. ANDERSON, Justice (concurring).

I concur in the result reached by the majority, but I write separately because of the weakness I perceive in the majority's mitigation analysis. Because of this weakness, the majority needs to extend itself to affirm the action of the MPCA—even given our narrow standard of review. Nevertheless, I agree that the court of appeals' decision was in error and thus reluctantly concur in the majority's holding. I do so because of the deferential standard of review we must apply to the decisions of administrative agencies.

The majority concludes that it does not have to address whether voluntary mitigation measures are appropriate for consideration under Minn. R. 4410.1700, subp. 7(C). It reaches this conclusion on the grounds that the record indicates that both mandatory and voluntary mitigation measures are in place and were analyzed by the MPCA. The majority also declares that it is irrelevant whether the MFRC has regulatory authority because the MPCA has regulatory authority and can enforce mitigation through its permits.

However, the majority relies heavily on the assumption that the MPCA intended to incorporate mitigation measures (i.e., some or all of the MFRC guidelines) as necessary conditions of its air operation permits. The majority reaches this conclusion based on language found in the MPCA's Findings of Fact and Conclusions, the document in which the MPCA made its final decision not to require an EIS. The majority specifically refers to the MPCA's conclusion that "mitigative measures have been incorporated into the project design and proposed permits."

While the majority's interpretation of the language in the MPCA's conclusion may be reasonable when taken by itself, a thorough review of the record raises serious questions about this conclusion. More particularly, the record reflects that neither the MPCA nor the DNR analyzed the potential environmental effects of Boise Cascade's project under the assumption that mitigation measures for *timber harvesting*, such as the MFRC timber harvesting guidelines, would be included in any MPCA permits. Instead, the language that the majority relies upon is more likely in reference to the mitigation measures that are to be incorporated into the permits regarding air and water pollution. The MPCA's findings contain a separate section with respect to each criteria, including mitigation; the single reference to timber harvesting mitigation in the mitigation section refers only to the ongoing implementation of the SFRA. Indeed, based on an analysis of the record, the MPCA appears to have specifically rejected incorporating timber harvesting mitigation measures into its permits.

A close reading of the proceedings before the MPCA confirms my conclusion. The record contains a letter sent to the MPCA on behalf of the Sierra Club, requesting that several mitigation measures,

including the MFRC guidelines, be included as conditions in the MPCA's permits. This is the first indication in the record that such a suggestion was ever considered. This suggestion was followed up by testimony from a Sierra Club volunteer at the final meeting of the MPCA Citizen's Board Environmental Review Committee. The volunteer referred to the letter and reiterated the suggestion that mitigation measures be included in any permit. The committee chair then interrupted the volunteer with this comment: "Sir, you know that we're talking about an adequacy decision of the EAW and not specific permit conditions. That would be a different process, so if you're going to talk just about permitting conditions, that would be for another time. Okay?" At this point, the chair was referring to the only issue before the committee—whether an EIS was required for the Boise Cascade project or whether the current record was sufficient. The chair reiterated his point at the close of the volunteer's comments, explaining that "You would get a chance, at a future date, you know. If we went ahead and determined that [the EAW] was adequate, it would go then to permit, and there is availability for public comment and to look at all that."

Later in the meeting, a Board member raised a similar question about enforcing Boise Cascade's commitment to the MFRC guidelines through permit conditions. In response, a member of the MPCA's environmental review staff responded that this was "not a new suggestion." The staff member went on to explain that inclusion of such guidelines in permits has never been done and that the agency does not advocate such an approach. The staff member stated:

I'm not aware of the agency taking that kind of action. We have had that suggestion with respect to the use of recycled fiber, to mandate recycled fiber us-

age. We have had—again, we have had commitments stated by companies, sometimes in writing, other times just verbally, but nevertheless commitments about implementing guidelines on lands that they made or with their loggers, sometimes writing it in the contracts that they do things, but its [sic] never been permitted.

I guess our attitude is that statements made in the record, the public record, are things that the PCA should be able to rely on when making permitting decisions, and we have not advocated carrying those over into permits.

Essentially, the MPCA rejected a suggestion very similar to the majority's interpretation of the language in the Findings. Aside from this discussion, the record does contain discussion of permits and permit conditions, but only with respect to mitigation of air and water pollution—not with respect to the effects of timber harvesting.

I acknowledge that in reaching its holding the majority does not exclusively rely on the permit conditions, which is the reason that I concur rather than dissent. To support its holding, the majority also relies upon the mitigation measures implemented and enforced by the United States Forest Service (USFS), the DNR, and certain Minnesota counties. However, the MPCA did not address these measures as part of its specific findings on mitigation and presumably did not base its final decision on them. Although these mitigation measures are certainly not as comprehensive as those recommended in the Forestry GEIS, the mitigation measures noted by the majority do constitute more than a scintilla of evidence in the record that the MPCA did, in fact, consider the extent to which the effects of the project were subject to mitigation by ongoing public regulatory authority. When deciding matters of

such import as the Boise Cascade project, it would be hoped, if not expected, that the MPCA would provide a stronger basis for its decision than was done here. But, given that our standard of review only requires that there be more than a scintilla of evidence in support of the MPCA's decision, I concur with the result reached by the majority.