*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1943**

John Matheson,
Relator,

vs.

Progressive Action - Minnesota,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed August 11, 2014
Affirmed
Schellhas, Judge**

Department of Employment and Economic Development
File No. 31238342-4

John Matheson, Hilltop, Minnesota (pro se relator)

Progressive Action - Minnesota, St. Paul, Minnesota (respondent)

Lee B. Nelson, Department of Employment and Economic Development, St. Paul, Minnesota (for respondent Department of Employment and Economic Development)

Considered and decided by Schellhas, Presiding Judge; Connolly, Judge; and Willis, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**SCHELLHAS**, Judge

In this certiorari appeal, pro se relator appeals the unemployment-law judge's decision that he is ineligible to receive employment benefits. We affirm.

**FACTS**

Relator John Matheson applied for unemployment benefits with respondent Minnesota Department of Employment and Economic Development (DEED) after quitting his job as a canvasser with Progressive Action - Minnesota (PAM), also referred to as Take Action Minnesota. After DEED determined that Matheson is ineligible for benefits because he quit his employment for other than a good reason caused by his employer, Matheson appealed.

An unemployment-law judge (ULJ) conducted an evidentiary hearing at which Matheson testified that he worked as a canvasser for approximately 30 years and, before working at PAM, had worked full time as a motor-coach driver for approximately ten years. At the time of the hearing, Matheson worked part time as a member of the Hilltop city council. Matheson began working as a canvasser for PAM on December 15, 2012. His primary job was to go door to door and encourage people to join the organization or renew their membership. For two of his first four weeks on the job, Matheson had a quota to make.

On January 17, 2013, Matheson was assigned to canvass an area with the canvassing coordinator, Gordon Ferguson, and some other canvassers. The group traveled by car. At one point, Matheson struggled with his seatbelt, which was not

2

working properly, and Ferguson said, "[Y]ou're acting helpless[,] John, stop acting helpless." Matheson felt that Ferguson's tone was "extremely contemptuous" and that Ferguson was attributing Matheson's difficulty with the seatbelt "to some kind of character deficiency." Soon after, the car made a hard stop and some of Matheson's papers fell on the floor. Matheson had trouble collecting the papers in the dark, resulting in Ferguson asking him whether he had been experiencing difficulty remembering things. Matheson felt that Ferguson asked the question in an "extremely contemptuous tone of voice."

Although, according to Matheson, the canvassers usually decided their areas of canvassing among themselves, Ferguson assigned Matheson the area in which he would be canvassing without consulting him on the matter and then changed the area three times. Matheson thought that Ferguson's assignment was "suspicious" because Matheson ended up canvassing an area that already had been canvassed within the preceding two months. Matheson believed that Ferguson purposefully assigned him to an area in which he believed that Matheson would not be successful. That evening, because Ferguson forgot to file forms to canvas, the police stopped the canvassing until Ferguson returned to St. Paul and faxed the requisite forms for a permit. Despite Ferguson's forgetfulness, Ferguson did not apologize to Matheson for making the comment to Matheson about his memory. Matheson characterized Ferguson's conduct as "a rather obscene double standard."

When the canvassing group left the canvassing area by car, Matheson noticed that his seatbelt was caught in the door and opened the door to remove it. Another canvasser

3

said, "John, don't open the door while the car is in motion, stop it." This comment upset Matheson. And, finally, when Matheson exited the car, he broke a fingernail that prevented him from playing guitar for a month and a half. At the end of the evening, Matheson resigned, telling Ferguson that he had had "quite enough." Matheson did not go into further detail. Ferguson, who was the highest-level employee in the office, called Matheson the next day. During that phone call, for the first time, Matheson confronted Ferguson about his behavior. Matheson believes that Ferguson's treatment of him the previous night was an attempt to make him quit his employment. Although the chairman of the board of directors stopped by the office once or twice a week, Matheson never informed the chairman about his concerns regarding Ferguson's conduct.

Matheson testified before the ULJ that he quit because (1) he experienced the "extremely abusive" behavior of Ferguson on the evening he quit, (2) other canvassers did not follow the canvassing plan, and (3) other canvassers asked him "inappropriate questions." Matheson felt that he was suited to the position because of his previous experience with campaigning for election to the city council. He agreed that the issue was not the job itself but was Ferguson.

The ULJ affirmed DEED's determination of ineligibility, finding that Matheson quit his employment for other than a good reason caused by his employer and that he did not meet the criteria for the trial-job exception. Matheson sought reconsideration, and the ULJ affirmed her decision. This certiorari appeal follows.

4

The purpose of chapter 268, Minnesota's unemployment-insurance program, is to assist those who are unemployed through no fault of their own. Minn. Stat. § 268.03, subd. 1 (2012). This court may reverse or modify a ULJ's decision if, among other reasons, it is based on an error of law or on factual findings that are not supported by substantial evidence. 2014 Minn. Laws, ch. 271, art. 1, § 1 (to be codified at Minn. Stat. § 268.105, subd. 7(d)(4)–(5) (2014)).[1] We review de novo a ULJ's determination that an applicant is ineligible for unemployment benefits. *Stassen v. Lone Mountain Truck Leasing, LLC*, 814 N.W.2d 25, 30 (Minn. App. 2012). We view the ULJ's factual findings in the light most favorable to the decision and will not disturb those findings when the evidence substantially sustains them. *Peterson v. Nw. Airlines Inc.*, 753 N.W.2d 771, 774 (Minn. App. 2008), *review denied* (Minn. Oct. 1, 2008). Substantial evidence is "(1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than some evidence; (4) more than any evidence; or (5) the evidence considered in its entirety." *Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 466 (Minn. 2002).

Matheson argues that this court should reverse the ULJ's decision because the ULJ erroneously credited his testimony about his start and end dates and declined to consider a background report from Allison & Taylor, a reference and background-check service.

---

[1] We cite the most recent version of this statute in this opinion because it has not been amended in relevant part. *See Interstate Power Co. v. Nobles Cnty. Bd. of Comm'rs*, 617 N.W.2d 566, 575 (Minn. 2000) (stating that, generally, "appellate courts apply the law as it exists at the time they rule on a case").

We are not persuaded. "A quit from employment occurs when the decision to end the employment was, at the time the employment ended, the employee's." 2014 Minn. Laws, ch. 251, art. 2, § 14 (to be codified at Minn. Stat. § 268.095, subd. 2(a) (2014)). An applicant who quits employment is ineligible for unemployment benefits unless one of ten enumerated exceptions applies. Minn. Stat. § 268.095, subd. 1 (2012). One exception occurs when the applicant quits "because of a good reason caused by the employer." *Id.*, subd. 1(1). Another is when the applicant quits "within 30 calendar days of beginning the employment because the employment was unsuitable for the applicant." *Id.*, subd. 1(3).

The ULJ concluded that Matheson did not quit for good reason caused by his employer, reasoning that Ferguson's treatment of Matheson on January 17 "would not have caused the average reasonable person to quit," and noted that Matheson did not complain to his employer before quitting, as required by Minn. Stat. § 268.095, subd. 3(c) (2012). "Whether an employee had good cause to quit is a question of law, which we review de novo." *Rowan v. Dream It, Inc.*, 812 N.W.2d 879, 883 (Minn. App. 2012) (quotation omitted). A good reason caused by the employer for quitting is a reason "(1) that is directly related to the employment and for which the employer is responsible; (2) that is adverse to the worker; and (3) that would compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment." Minn. Stat. § 268.095, subd. 3(a) (2012). "If an applicant was subjected to adverse working conditions by the employer, the applicant must complain to the employer and give the employer a reasonable opportunity to correct the adverse working conditions before that

6

may be considered a good reason caused by the employer for quitting." Minn. Stat. § 268.095, subd. 3(c).

The record is void of any evidence that Ferguson intentionally mistreated Matheson or attempted to cause Matheson to fail at his job. We agree with the ULJ that Ferguson's treatment of Matheson on January 17 would not have caused a reasonable person to quit. Moreover, Matheson admitted that he did not complain to Ferguson or the chairman of the board before quitting. Assuming that Ferguson's behavior required correction, section 268.095, subdivision 3(c), required Matheson to give notice to his employer of the offensive behavior to give the employer an opportunity to correct the behavior. We hold that the ULJ did not err in concluding Matheson is ineligible for unemployment benefits because he did not quit for good reason caused by his employer.

Matheson also argues that the ULJ erred by deciding that he is ineligible for unemployment benefits under the trial-job exception to the general prohibition against awarding benefits to employees who quit employment. For the trial-job exception to be applicable, the employee must have quit employment "within 30 calendar days of beginning the employment because the employment was unsuitable for the applicant." Minn. Stat. § 268.095, subd. 1(3); *see Wiley v. Dolphin Staffing—Dolphin Clerical Grp.*, 825 N.W.2d 121, 125 (Minn. App. 2012) (holding that "for purposes of the 30-day unsuitability exception, an employee who gives notice of quitting to an employer in advance of separating from employment is deemed to have quit at the time of notice"), *review denied* (Minn. Jan. 29, 2013). Whether work is suitable for an applicant is a question of fact. *Zielinski v. Ryan Co.*, 379 N.W.2d 157, 159 (Minn. App. 1985). Here,

7

the ULJ found no evidence in the record that Matheson's work at PAM was unsuitable for him. Indeed, Matheson testified that he quit PAM because of Ferguson, not because of the work. Because the work was not unsuitable for Matheson, he is not eligible for unemployment benefits under the trial-job exception.

Matheson contends that he quit his employment with PAM within 30 calendar days of beginning the employment on December 15, 2012. But at the hearing before the ULJ, although Matheson revealed uncertainty about the date that he quit his employment, he ultimately testified that his last day "probably would have been actually January 17." Matheson complains that the ULJ placed too much weight on his "uncertain" testimony about his quit date and also erred by rejecting evidence related to his dates of employment. This evidence consists of a background report obtained by Matheson from Allison & Taylor after he quit his employment with PAM. According to the report, in a May 21, 2013 phone call, Ferguson told Allison & Taylor that Matheson worked for PAM from December 18, 2012, until January 9, 2013. According to Matheson's testimony, he learned of the report through a May 31, 2013 e-mail. The ULJ declined to consider the background report on the basis that she only had authority to consider the events leading up to the time when Matheson quit his job and that the evidence therefore was irrelevant. The ULJ did not otherwise analyze the evidence on the basis of hearsay or reliability. Because the record contains substantial evidence to support the ULJ's finding that Matheson quit his work with PAM on January 17, 2013, we conclude that any error by the ULJ in not considering Allison & Taylor's report is harmless and of no consequence to this opinion.

8

Because Matheson did not quit his employment for a good reason caused by his employer and because his suitability for the canvassing position renders the trial-job exception inapplicable, we affirm the ULJ's decision that Matheson is ineligible for unemployment benefits.

**Affirmed.**