*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A14-0106**
**A14-0107**
**A14-0108**
**A14-0109**
**A14-0110**
**A14-0111**
**A14-0112**
**A14-0113**

Sarah N. Lewis,
Relator (A14-0106),

Carole M. Smith,
Relator (A14-0107),

Leslie J. Shank,
Relator (A14-0108),

Sunmi Chang,
Relator (A14-0109),

Daria T. Adams,
Relator (A14-0110),

Michael B. Israelievitch,
Relator (A14-0111),

Joshua N. Koestenbaum,
Relator (A14-0112),

Lynn M. Erickson,
Relator (A14-0113),

vs.

St. Paul Chamber Orchestra Society,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed December 8, 2014**
**Affirmed**
**Peterson, Judge**

Department of Employment and Economic Development
File No. 31470871-2

Richard A. Williams, Jr., R.A. Williams Law Firm, P.A., St. Paul, Minnesota (for relators)

Grant T. Collins, Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, Minnesota (for respondent St. Paul Chamber Orchestra Society)

Lee B. Nelson, Department of Employment and Economic Development, St. Paul, Minnesota (for respondent Department of Employment and Economic Development)

Considered and decided by Reyes, Presiding Judge; Peterson, Judge; and Reilly, Judge.

## UNPUBLISHED OPINION

**PETERSON**, Judge

In these consolidated petitions, relators seek certiorari review of an unemployment-law judge's (ULJ) decision that they are ineligible for unemployment benefits because their weekly earnings exceeded the amount of their weekly unemployment benefits. We affirm.

## FACTS

Relators Sarah N. Lewis, Carole M. Smith, Leslie J. Shank, Sunmi Chang, Daria T. Adams, Michael B. Israelievitch, Joshua N. Koestenbaum, and Lynn M. Erickson are musicians employed by respondent St. Paul Chamber Orchestra (SPCO) and represented

2

by Twin Cities Musicians Union Local 30-73.  On April 30, 2013, the SPCO and the union executed a collective-bargaining agreement (CBA) that applies from April 30, 2013, through June 30, 2016.  The CBA applies to four specific time periods, a two-month term from April 30 to June 30, 2013, and beginning July 1, 2013, three contract years that run from July 1 through June 30 of the following year.

Under the CBA, a concert season is a 40-week period that must be completed between August 15 and June 15 of the following year.[1]  A musician is required to perform during 32 weeks of the 40-week concert season and is entitled to four weeks of vacation during the concert season.  Although musicians are required to perform in SPCO concerts only during the concert season, the CBA requires them to maintain artistic proficiency during the entire contract year by participating in activities, including individual practice, chamber music and recital services, teaching, and performing at summer festivals and with other orchestral ensembles.  Musicians are also required to communicate with the SPCO throughout the year.

The CBA contains the following compensation terms:

> **B.2.1  Guaranteed Annual Salary**
> For each Contract Year, the Guaranteed Annual Salary of each Musician shall be $60,000 . . . .
> **B.2.2  Overscale**
> Any Musician may negotiate with the Society for Overscale.  Overscale may be negotiated up or down from year to year.  If any is agreed to, the amount and payment terms and conditions will be set forth in that Musician's Individual Contract. . . .

---

[1] For the contract year beginning July 1, 2015, the concert season may be completed in any 43-week period between August 15 and June 15.

### B.2.3 Weekly Minimum Scale
A Musician's Weekly Minimum Scale shall be $1,666.67.

The CBA also provides for additional compensation when a musician performs excess services or has more than 32 performance weeks during a concert season. For each performance week over 32, the additional compensation is the musician's weekly minimum scale plus any overscale required under the musician's individual contract.

Under the CBA, the guaranteed annual salary and annual overscale are paid in equal installments during the contract year according to the SPCO's regular payroll schedule and consistent with its regular payroll practices. Additional compensation is paid on the regular payroll immediately following the week in which it was earned. The SPCO's regular payroll practice is to pay musicians on a biweekly basis throughout the 52-week contract year.

Relators assert that, because the CBA does not specifically include an off-season payment rate or a payment schedule, their salaries are intended as payment only for services performed during the concert season. Relators submitted claims for unemployment benefits for the period from July 1, 2013, until the beginning of the 2013-2014 concert season. For the pay periods between July 1 and August 4, 2013, each relator received payments from the SPCO in pretax amounts that exceeded $1,100 per week. Each relator established an unemployment-benefit account with a weekly benefit amount of $597.

Respondent department of employment and economic development consolidated relators' claims, and the chief ULJ referred them directly to a hearing under Minn. Stat.

4

§ 268.101, subd. 3a. The ULJ determined that relators were not entitled to unemployment benefits because they were not unemployed. On reconsideration, the ULJ affirmed the determination that relators were not unemployed but modified the rationale underlying that determination. On reconsideration, the ULJ relied on the facts that each relator established a weekly unemployment benefit amount of about $600; between April 30 and June 30, 2013, the SPCO made payments to relators exceeding $1,000 per week; between July 1, 2013, and the hearing date, the SPCO paid each relator equal biweekly installments of the sum of a guaranteed annual salary and any overscale amounts, which exceeded each relator's weekly unemployment benefit amount; and throughout the contract year, relators were required to maintain high levels of artistic proficiency and receive and respond to communications from the SPCO. The ULJ specifically rejected relators' argument that the salary payments received during the off season were compensation for services performed during the concert season.

This certiorari appeal followed.

## D E C I S I O N

We may reverse or modify a ULJ's decision if a relator's substantial rights have been prejudiced because the findings, inferences, conclusion, or decision are made upon unlawful procedure, affected by an error of law, not based on substantial evidence in the record, or arbitrary or capricious. 2014 Minn. Laws ch. 271, art. 1, § 1, at 1028-29 (to be codified at Minn. Stat. § 268.105, subd. 7(d)(3)-(6) (2014).

"We review de novo a ULJ's determination that an applicant is ineligible for unemployment benefits." *Stassen v. Lone Mountain Truck Leasing, LLC*, 814 N.W.2d

5

25, 30 (Minn. App. 2012). But this court views the ULJ's underlying factual findings in the light most favorable to the decision and will not disturb them if they are supported by substantial evidence. *Peterson v. Nw. Airlines, Inc.*, 753 N.W.2d 771, 774 (Minn. App. 2008), *review denied* (Minn. Oct. 1, 2008); *see also Minn. Ctr. For Envt'l Advocacy v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 464 (Minn. 2002) (defining substantial evidence).

Under the Minnesota Unemployment Insurance Law, Minn. Stat. §§ 268.001-.98 (2012), to be eligible for unemployment benefits for any week, an applicant must be "unemployed as defined in [Minn. Stat. §] 268.035, subd. 26." Minn. Stat. § 268.085, subd. 1(3). That subdivision provides that "[a]n applicant is considered 'unemployed' (1) in any week that the applicant performs less than 32 hours of service in employment, covered employment, noncovered employment, self-employment, or volunteer work; *and* (2) any earnings with respect to that week are less than the applicant's weekly unemployment benefit amount." Minn. Stat. § 268.035, subd. 26 (emphasis added).

The ULJ found that the evidence was insufficient to show that any of the relators performed 32 or more hours of service during the weeks for which they sought unemployment benefits. Therefore, relators met the first of the two criteria for being considered unemployed. But relators concede that they all received payments from the SPCO during each of the 12 weeks not included in the concert season in amounts that exceeded their weekly unemployment benefits. Thus, the only issue is whether the SPCO payments that relators received during those 12 weeks were "earnings with respect to"

6

those weeks. If they were "earnings with respect to" those weeks, relators were not considered unemployed.

The Minnesota Unemployment Insurance Law does not define "earnings." Therefore, "earnings" is construed according to its common and approved usage. Minn. Stat. § 645.08(1) (2012). In common usage, "earnings" means, "[s]alary or wages." *The American Heritage Dictionary of the English Language* 561 (5th ed. 2011). The SPCO payments that relators received were installments of their annual salaries under the CBA. Consequently, the payments were "earnings." The CBA required that relators' annual salaries be paid in equal installments during the contract year according to the SPCO's regular payroll schedule. When relators received the payments, the regular payroll schedule was biweekly salary payments. Consequently, relators were entitled to receive a salary installment for each two-week period, and the installments received for a two-week period were "earnings with respect to" those two weeks.

Relators argue that the relevant statutory provision is the definition of "wages paid."[2] "'Wages paid' means the amount of wages that have been actually paid *or* that have been credited to or set apart so that payment and disposition is under the control of the employee." Minn. Stat. § 268.035, subd. 30(a) (emphasis added). "Wages paid does not include wages earned but not paid except as provided for in this subdivision." *Id.*, subd. 30(b). "Wages" is defined as "all compensation for services" subject to specified

---

[2] Previously "unemployed" was defined in terms of "wages payable." Minn. Stat. § 268.04, subd. 23 (1996). In 1998, the legislature substituted "earnings" for "wages payable" in the definition of "unemployed." 1998 Minn. Laws ch. 265, §§ 4, at 208; 46, at 251.

exceptions, none of which relators claim apply to the SPCO payments they received between July 1, 2013, and the beginning of the 2013-2014 concert season. Minn. Stat. § 268.035, subd. 29(a).[3]

Relators do not explain how the definition of wages paid is relevant to the meaning of earnings. But even if it is relevant, relators' statutory-construction argument is not persuasive. Relators argue that the SPCO payments they received between July 1, 2013, and the beginning of the 2013-2014 concert season do not fall within the definition of wages paid because payment and disposition were not under relators' control. When interpreting a statute, "phrases are construed according to rules of grammar." Minn. Stat. § 645.08(1) (2012). Applying the rules of grammar, the requirement "that payment and disposition is under the control of the employee" modifies only wages "that have been credited to or set apart" and does not modify "wages that have been actually paid." The requirement that payment and disposition be under the employee's control, therefore, does not apply to the biweekly SPCO payments that relators received. Those payments were wages that were "actually paid."

Relators also argue that the SPCO payments they received between July 1, 2013, and the beginning of the 2013-2014 concert season do not constitute earnings for that period because the payments were compensation for services performed during the 2012-

---

[3] In 2014, the legislature amended the definition of wages to mean "all compensation for employment." 2014 Minn. Laws ch. 251, art. 1, § 1, at 841. The amendment became "effective the fourth Sunday following final enactment, and applies to all matters and issues pending determination or decision." *Id.*, § 8, at 848. Relators argue that the amendment supports their position because the definition of wages is no longer tied to services. But the previous definition did not require that the wages correspond to the amount of and time when services were provided.

8

2013 concert season. The record contains no evidentiary support for this assertion. Rather, the payments were made according to the CBA, which became effective April 30, 2013, and no evidence in the record indicates that there is any relationship between the CBA and services performed before its effective date.

Because relators have failed to show that the ULJ erred in applying the law, they are not entitled to reversal. *See Ywsef v. Teleplan Wireless Servs., Inc.*, 726 N.W.2d 525, 530 (Minn. App. 2007) (rejecting relator's claim that she did not receive fair hearing when she failed to show that her substantial rights were prejudiced); *Midway Ctr. Assocs. v. Midway Ctr. Inc.,* 306 Minn. 352, 356, 237 N.W.2d 76, 78 (1975) (stating that to prevail on appeal, an appellant must show both error and prejudice resulting from the error).

Relators raise several issues regarding interpretation of the CBA, including procedural issues, constitutional claims, and a challenge to the ULJ's authority to interpret the CBA. The CBA-interpretation issues are relevant only to relators' argument that they lacked control over payment and disposition of wages. Because relators' statutory-interpretation argument fails, we do not address the issues regarding interpretation of the CBA.

**Affirmed.**

9