**In the Matter of a REQUEST FOR ISSUANCE OF the SDS GENERAL PERMIT MNG300000 for Ballast Water Discharges from Vessels Transiting Minnesota State Waters of Lake Superior.**

No. A08–1828.

Court of Appeals of Minnesota.

July 28, 2009.

Lori Swanson, Attorney General, Robert B. Roche, Assistant Attorney General, St. Paul, MN, for respondent Minnesota Pollution Control Agency.

Matthew J. Norton, Minnesota Center for Environmental Advocacy, St. Paul, MN, for relator Minnesota Center for Environmental Advocacy.

Considered and decided by SCHELLHAS, Presiding Judge; LARKIN, Judge; and MUEHLBERG, Judge.[*]

## OPINION

LARKIN, Judge.

Relator, an environmental-advocacy group, asserts that the Minnesota Pollution Control Agency erred as a matter of law in its issuance of a permit regulating ballast-water discharge into Minnesota waters of Lake Superior, arguing that the agency (1) erroneously concluded that it was not required to conduct a nondegradation review, (2) failed to conduct an appropriate nondegradation review, and (3) used an inadequate process to determine how stringent the permit's terms must be in order to preserve Lake Superior's existing water quality. Relator requests that we remand for a thorough nondegradation review. Because the Minnesota Pollution Control Agency correctly determined that a nondegradation review was required and because the process it used to conduct the nondegradation review and to adopt the permit terms was neither based on an error of law nor arbitrary or capricious, we affirm.

## FACTS

This appeal involves a challenge to the first permit issued to regulate the discharge of ballast water into Minnesota waters of Lake Superior. Ballast water is water that is taken onboard a ship to improve the ship's stability, draft, and buoyancy. Vessels take on and discharge ballast water as cargo is loaded and unloaded or as weather conditions change. Ballast-water discharge from commercial vessels may contain pollutants in the form of invasive aquatic species. Until recently, ballast-water discharge has not been subject to regulation or permitting requirements under the Federal Water Pollution Control Act (commonly referred to as the Clean Water Act (CWA)), see 33 U.S.C. §§ 1251–1387 (2006), because the United States Environmental Protection Agency (EPA) recognized an exemption for ballast-water discharge. *Nw. Envtl. Advocates v. United States Environmental Protection Agency,* No. C 03–05760 SI, 2006 WL 2669042, at *1 (N.D.Cal. Sept. 18, 2006) (citing 40 C.F.R. § 122.3(a) (2006)). In response to a federal court's ruling that invalidated the EPA regulation exempting ballast-water discharge, the EPA was required to develop a regulatory plan for ballast-water discharge. *Id.* at **11–12, 15. (holding that a regulation exempting ballast-water discharge from the CWA permitting requirements invalid but allowing the exemption to remain in effect until September 30, 2008, while the EPA developed a regulatory plan).

In 2007, the Minnesota Pollution Control Agency (MPCA) began to develop a permit that would regulate ballast-water discharge into Minnesota Waters of Lake Superior, and it eventually issued Ballast Water Discharge State Disposal System General Permit No. MNG300000 (SDS general permit). Because issuance of the SDS general permit involved the creation of a new regulatory system, MPCA utilized a stakeholder process to develop the permit. MPCA held four public stakeholder meetings to solicit input on issues to be addressed in the permit. MPCA proposed a draft ballast-water-discharge permit and provided public notice of the permit for 30 days. MPCA also provided public notice of a fact sheet explaining the terms of the permit, the conditions of the permit, and MPCA's rationale for proposing those terms and conditions.

---

[*] Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

The SDS general permit requires vessels that operate on Minnesota waters of Lake Superior to comply with seven proven best-management practices immediately upon issuance of the permit. The permit also requires ships operating in Minnesota to treat their ballast water to eliminate biological organisms before discharge in compliance with biological-treatment standards. Because ballast water has not historically been subject to permitting requirements, neither rule nor statute establishes specific treatment requirements for ballast-water discharge. Thus, MPCA staff reviewed ballast-water-treatment technologies that were currently in development and evaluated the status and available performance data on 15 separate treatment systems. MPCA ultimately decided to impose treatment standards from the International Maritime Organization (IMO), which limit the number of biological organisms that a ship may discharge based on the type and size of organisms. MPCA staff concluded that the IMO standards were the most stringent treatment standards that would be technologically available during the term of the permit.

The SDS general permit requires existing ships to comply with the IMO treatment standards no later than January 1, 2016. Ships constructed after January 1, 2012, are required to comply before operating in Minnesota. MPCA based its compliance deadlines on the following factors: (1) the need to develop technology to meet the IMO standards; (2) the need to verify the effectiveness of such technology in freshwater conditions; (3) the need to develop a maintenance system for treatment technology; and (4) the need for existing vessels to go into dry-dock for installation of treatment systems.

Relator Minnesota Center for Environmental Advocacy (MCEA) submitted comments to MPCA raising concerns regarding the proposed SDS general permit.

MCEA recommended that the permit be more stringent and argued for adoption of the so-called "California" standards instead of the IMO standards. Other commentators, including representatives from the shipping industry, opined that the draft permit was too stringent, arguing that (1) there is no commercially available technology that can meet the standards; (2) the implementation timeline is too short and unrealistic; (3) vessels that operate solely on the Great Lakes should not be subject to the permit requirements; and (4) the State of Minnesota should not attempt to regulate ballast-water discharge, in light of the EPA's plan to issue a national pollutant-discharge-elimination-system general permit regulating ballast-water discharge in the near future.

The MPCA citizens' board held a public hearing on the proposed permit on September 23, 2008. MCEA provided testimony at the public hearing. MCEA asked MPCA to include stricter discharge standards in the permit and to shorten the implementation deadlines. At the conclusion of the public hearing, the MPCA citizens' board voted unanimously to issue the SDS general permit, and it adopted findings of fact, conclusions of law, and an order authorizing issuance of the permit. MCEA's certiorari appeal follows.

### ISSUES

I. Did MPCA erroneously interpret the nondegradation rule?

II. Did MPCA fail to conduct an adequate nondegradation review?

III. Did MPCA fail to ensure that the standards it adopted to regulate ballast-water discharge will preserve Lake Superior's existing water quality?

### ANALYSIS

■ This court reviews a final decision of the MPCA under the Minnesota Admin-

istrative Procedures Act, Minn.Stat. §§ 14.63–.69 (2008). Minn.Stat. § 115.05, subd. 11 (2008); *Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 463–64 (Minn. 2002) (holding that in addition to its application to decisions that arise out of contested-case hearings, the Minnesota Administrative Procedures Act applies to "an area such as environmental review, uniquely involving application of an agency's expertise, technical training, and experience"). We may reverse or modify the agency's decision if the agency's findings, inferences, conclusions, or decisions are affected by an error of law, unsupported by substantial evidence in view of the entire record as submitted, or arbitrary or capricious. Minn.Stat. § 14.69(d)-(f). On appeal, the party challenging the agency's decision has the burden of proof. *Markwardt v. Water Res. Bd.*, 254 N.W.2d 371, 374 (Minn.1977) (interpreting a previous version of Minn.Stat. § 14.69); *Minn. Ctr. for Envtl. Advocacy v. Comm'r of Minn. Pollution Control Agency*, 696 N.W.2d 95, 100 (Minn.App.2005) (*Princeton*).

▇▇▇ "[D]ecisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977). The rationale for deference to administrative agency decisions is rooted in the separation-of-powers doctrine and the agency's training and expertise in the subject matter. *See id.* But an appellate court need not defer to an agency's interpretation of its own regulation when the regulation's language is clear and understandable. *Resident v. Noot*, 305 N.W.2d 311, 312 (Minn.1981).

▇▇▇ The supreme court has summarized the approach to judicial review of agency decisions concerning regulations as follows: (1) "when a decision turns on the meaning of . . . an agency's own regulation, it is a question of law that [appellate courts] review de novo"; (2) "when the language of the regulation is clear and capable of understanding, [an appellate court] give[s] no deference to the agency's interpretation and may substitute [its] . . . judgment for that of the agency"; and (3) "when the relevant language of the regulation is unclear or susceptible to different reasonable interpretations, . . . [an appellate court] will give deference to the agency's interpretation and will generally uphold that interpretation if it is reasonable." *In re Annandale NPDES/SDS Permit Issuance*, 731 N.W.2d 502, 515 (Minn.2007) (*Annandale*). The supreme court further explained that "when determining whether to defer to an agency, we will consider that agency's expertise and special knowledge." *Id.* When an agency's decision relies on application of the agency's technical knowledge and expertise to the facts presented, deference should be afforded to the agency's decision. *In re Review of 2005 Annual Automatic Adjustment of Charges for All Elec. & Gas Utilities*, 768 N.W.2d 112, 118, 2009 WL 2045404, at *5 (Minn. July 16, 2009). Deference to an agency's interpretation of a statute is particularly appropriate " 'when the administrative practice at stake involves a contemporaneous construction of a statute by the people charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.' " *Annandale*, 731 N.W.2d at 512 (quoting *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)) (other quotation omitted).

MCEA argues that this court should remand the SDS general permit on three grounds. First, MCEA asserts that

MPCA erroneously concluded that ballast-water discharge does not create an "expanded discharge" by focusing on volume, without regard to other changes that may cause an expanded discharge. Second, MCEA contends that MPCA failed to conduct a nondegradation review prior to issuing the permit; in the alternative, MCEA argues that MPCA's nondegradation review is inadequate. Third, MCEA argues that MPCA failed to rely on a water-quality-based rationale when determining that the standards it adopted to regulate ballast-water discharge will preserve Lake Superior's existing water quality. We address each in turn.

## I.

Under state and federal law, MPCA is the Minnesota state agency charged with enforcing and administering the federal CWA and regulations promulgated under the CWA. *Id.* at 510 (citing Minn.Stat. § 115.03, subds. 1, 5 (2006); 40 C.F.R. § 123.25(a) (2006)). MPCA is authorized and required to administer and enforce all laws relating to the pollution of any waters of the state. *Id.*, subd. 1(a). MPCA is authorized to require and issue a general, state disposal-system permit for ballast-water discharge under Minn.Stat. §§ 115.03, subd. 1(e), 115.07 (2008), and Minn. R. 7001.0030 (2007). MPCA is authorized to issue a single general permit to a category of permittees whose activities are the same or substantially similar, under Minn. R. 7001.0210 (2007).

Pursuant to its authority under the CWA, the EPA requires each state to develop a nondegradation policy that meets minimum standards. 40 C.F.R.

§ 131.12(a) (2008). A state's policy must be designed to maintain the level of water quality necessary to protect existing water uses. *See id.* (a)(1). Minnesota's nondegradation policy is set forth in Minn. R. 7050.0180 (2007). The rule sets out the policy of MPCA to prohibit or control new or expanded discharges to protected water.[1] Minn. R. 7050.0180, subp. 1. Subpart 6 of the rule addresses restricted discharges and states:

> No person may cause or allow a *new or expanded discharge* of any sewage, industrial waste, or other waste to any of the following waters *unless there is not a prudent and feasible alternative to the discharge:*
>
> A. Lake Superior, except those portions identified in subpart 3 as a prohibited discharges zone;
>
> . . . .
>
> If a new or expanded discharge to these waters is permitted, the *agency shall restrict the discharge to the extent necessary to preserve the existing high quality,* or to preserve the wilderness, scientific, recreational, or other special characteristics that make the water an outstanding resource value water.

*Id.*, subp. 6 (emphasis added). The rule prohibiting new or expanded discharge allows for an exception when there is no "prudent and feasible alternative to . . . discharge." *Id.*

Lake Superior is designated as protected water under the nondegradation rule, and MCEA does not claim that there is a prudent and feasible alternative to ballast-water discharge into Lake Superior. *Id.*,

---

1. The nondegradation rule defines water designated as "[o]utstanding resource value waters" as "waters of the state with high water quality, wilderness characteristics, unique scientific or ecological significance, exceptional recreational value, or other special qualities which *warrant stringent protection* from pollution." Minn. R. 7050.0180, subp. 2(A) (emphasis added). For purposes of this opinion, we refer to "outstanding resource value water" as "protected water."

subps. 2(A), 6(A). Instead, MCEA claims that MPCA made a legal error in its interpretation and application of the state's nondegradation rule. MCEA argues that MPCA interpreted the rule in a manner that is inconsistent with its clear and understandable language and, as a result, erroneously failed to conduct a nondegradation review. MCEA reasons that to the extent that MPCA's findings, conclusions, and decision are affected by its erroneous interpretation of regulatory language that is clear and understandable, judicial deference is not required.

The alleged error concerns the definition of "expanded discharge." The nondegradation rule defines an "expanded discharge" as

> a discharge that changes in *volume, quality, location, or any other manner* after the effective date the outstanding resource value water was designated … [as protected water], such that an increased loading of one or more pollutants results. In determining whether an increased loading of one or more pollutants would result from the proposed change in the discharge, *the agency shall compare the loading that would result from the proposed discharge with the loading allowed by the agency as of the effective date of* [the protected water] designation. …

*Id.*, subp. 2(C) (emphasis added).

MPCA states that Lake Superior was designated as protected water on November 5, 1984.[2] MPCA concluded that vessels that were in operation at the time of Lake Superior's 1984 designation as protected water will not generate an expanded discharge within the meaning of the nondegradation rule. MPCA reasoned that a change in ballast-water discharge from

vessels in operation on Lake Superior prior to 1984 is unlikely to result in increased pollutant loading because (1) "the size and number of ballast water tanks are fixed when a ship is constructed"; and (2) "MPCA applied its technical expertise [to] conclude that the environmental threats from ballast water discharges have remained relatively unchanged since 1959."

■ MCEA argues that MPCA misinterpreted the term "expanded discharge" by focusing solely on potential changes in the volume of ballast-water discharge. MCEA correctly notes that an "expanded discharge" may also result from changes in "quality, location, or any other manner." *Id.* And MCEA correctly argues that the potential inclusion of new invasive species in ballast-water discharge would constitute a change in quality. But a change in the quality of discharge does not result in an "expanded discharge" under the rule unless "an increased loading of one or more pollutants" results. *Id.* And an increased loading in pollutants does not result unless the loading that results from the proposed discharge is greater than the loading allowed as of the effective date of the protected-water designation. *Id.*

MCEA misstates the standard for determining whether a change in discharge causes an increased loading of pollutants, claiming that the relevant comparison is between "the loading of each pollutant in the discharge with the loading of each pollutant on the [date] the waterbody was designated [as protected water]," or between "*future pollutant loads expected* from the proposed discharge [and] the historic pollutant loads as of the effective date of the receiving water's [protected] water designation." Based on this incorrect

---

**2.** MCEA does not challenge MPCA's assertion regarding the date of Lake Superior's protect-ed-water designation.

statement of the standard, MCEA argues that since ballast-water discharge under the SDS general permit will contain invasive species that were not present in ballast-water discharge in 1984, there will be an increased loading of pollutants. But the nondegradation rule clearly directs a comparison of "the loading that would result from the proposed discharge with the loading *allowed by the agency* as of the effective date of [the protected water] designation." *Id.* (emphasis added). The relevant comparison is not between the contents of the proposed discharge and the discharge that existed in 1984, as MCEA incorrectly asserts.

Applied to the current facts, the nondegradation rule requires MPCA to compare the pollutant loading that will result from ballast-water discharge after implementation of the SDS general permit (the proposed discharge) with the pollutant loading from ballast-water discharge that was allowed when Lake Superior was designated as protected water. Because pollutant loading from ballast-water discharge was unrestricted at the time of Lake Superior's 1984 protected-water designation, the restricted pollutant loading that will result from the proposed discharge will not result in increased pollutant loading. By definition, the proposed discharge does not constitute an "expanded discharge." *See id.* Thus, MPCA did not err in interpreting the regulatory language concerning "expanded discharge."

Moreover, MPCA recognized that any vessels operating on Lake Superior that came into existence after 1984 generate new discharges. A "new discharge" is defined as "a discharge that was not in existence on the effective date the outstanding resource value water was designated as" protected water. *Id.,* subp. 2(B). Because the nondegradation rule unequivocally requires restrictions "to the extent necessary to preserve existing high [water] quality" whenever a new discharge to protected water is permitted, MPCA recognized that the nondegradation rule applied. *Id.,* subp. 6. Thus, regardless of its failure to consider factors other than volume in its assessment of the potential for an "expanded discharge," MPCA correctly determined that a nondegradation review was required during the permitting process, and remand is inappropriate. *See* Minn. R. Civ. P. 61 (stating that "[t]he court at every stage of the proceeding must disregard any error or defect ... which does not affect the substantial rights of the parties").

## II.

MPCA maintains that it conducted an adequate nondegradation review. MCEA contends that MPCA failed to conduct a nondegradation review. Alternatively, MCEA contends that the MPCA's purported nondegradation review was inadequate and not entitled to judicial deference. MCEA bases its contentions on the lack of evidence in the record regarding (1) an assessment and characterization of Lake Superior's existing water quality (i.e., a baseline standard) and (2) an analysis and discussion of the effects of new invasive species on existing water quality.

MCEA's challenge focuses on the form or content of MPCA's nondegradation review and the process that MPCA used to adopt the treatment standards in the SDS general permit. MCEA argues that a proper nondegradation review requires a baseline analysis of Lake Superior's existing water quality, an assessment of the risk and manner of water degradation from the individual invasive species believed most likely to invade Lake Superior, and an analysis and determination that the biological-performance standards in the SDS general permit will in fact preserve

the existing water quality in light of potential invasive species.

■■ Rule 7050.0180 is silent regarding the form and content of a nondegradation review; it does not dictate a particular procedure to be used to determine whether proposed discharge restrictions are adequate to preserve existing water quality. The nondegradation rule simply requires that when a new or expanded discharge is permitted, the acting agency must "restrict the discharge to the extent necessary to preserve the existing high [water] quality." *Id.*, subp. 6. The rule leaves open the question of how the agency arrives at its determination regarding the necessary restrictions. "When a statute or regulation is silent on a precise issue, that silence may be evidence of ambiguity." *In re Alexandria Lake Area Sanitary Dist. NPDES/SDS Permit No. MN0040738,* 763 N.W.2d 303, 311 (Minn.2009). The rule's failure to provide direction regarding the procedure, form, and content of a nondegradation review results in ambiguity. Because rule 7050.0180 is ambiguous regarding the procedure, form, and content of a nondegradation review, MPCA's implementation of the rule is entitled to deference. *See Noot,* 305 N.W.2d at 312 (stating that a reviewing court defers to an agency's interpretation when the language subject to construction is ambiguous).

MPCA's nondegradation review is also entitled to deference because ballast-water discharge was not previously subject to regulation in Minnesota, and MPCA's issuance of the SDS general permit involved implementation and administration of a new regulatory system. *See Annandale,* 731 N.W.2d at 512 (discussing the deference afforded to an agency's interpretation of a statute, particularly when it involves a new regulation and the agency is required to enforce and administer the statute). Moreover, precedent dictates that a decision of MPCA is entitled to deference when it involves special knowledge related to MPCA's technical training, education, and experience. *See, e.g., id.* at 510, 523–25 (affording deference to MPCA's interpretation of a regulation under the CWA requiring states to establish water-quality standards to protect public health and welfare).

In support of its argument that MPCA's nondegradation review was inadequate and not entitled to deference, MCEA relies primarily on our decision in *Princeton,* 696 N.W.2d 95, in which we held that a portion of the nondegradation rule is unambiguous on its face. *Id.* at 108 (rejecting MPCA's argument that the term "existing high quality" is so technical in nature that its interpretation requires the agency's experience and expertise, and concluding that the term is clear and capable of understanding such that no deference to the agency is required). In *Princeton,* the City of Princeton applied to MPCA for a National Pollutant Discharge Elimination System/State Disposal System permit (NPDES/SDS permit) that would allow the city to construct a new wastewater-treatment plant that would triple the capacity of its current treatment method, and in the process, discharge 1,905,000 gallons of wastewater per day directly into the Rum River, which is designated as protected water. *Id.* at 98. Because the proposed discharge constituted a new or expanded discharge into protected water, MPCA required the city to perform a nondegradation study as part of the permit application. *Id.* at 98–99. MPCA circulated the proposed permit for public comment, and MCEA requested a contested-case hearing. *Id.* at 99. MPCA denied MCEA's request for a contested-case hearing and issued the NPDES/SDS permit. *Id.* at 100. MCEA appealed. *Id.*

On appeal, we concluded that MPCA used an arbitrary and capricious method of determining the restrictions necessary to protect existing water quality because it set limits that achieved a water quality only at or slightly above the minimum standard required for all waters, without making a baseline determination of the existing water quality to be preserved. *Id.* at 108. We reasoned that "[w]ithout defining what the existing quality of the water is, it is not possible to evaluate whether Princeton's proposed discharge has been restricted to the extent necessary to preserve that quality, making any cost/benefit analysis meaningless." *Id.* We recognized that the permit involved the first regulated discharge of pollutants into the Rum River and held that the " 'existing high quality' of water in a river *into which no discharge has been previously permitted* is the quality of the water prior to the issuance of any permit to discharge." *Id.* (emphasis added). We held that "[t]he MPCA must establish the existing water quality of the Rum River and impose necessary requirements and restrictions on Princeton's proposed [wastewater-treatment plant] to protect that quality." *Id.* at 109.

MCEA argues that our holding in *Princeton* requires MPCA to establish a baseline measure of Lake Superior's existing water quality and to impose restrictions that maintain that baseline. MPCA counters that *Princeton* is factually distinguishable and does not dictate the procedure, form, and content of MPCA's nondegradation review in this case. MPCA's argument is persuasive.

*Princeton* is factually distinguishable in significant respects. In *Princeton,* the receiving body of water, the Rum River, had not previously been subject to the pollutant discharge at issue. *Id.* at 108. By contrast, Lake Superior has been receiving ballast-water pollutants without restriction for as long as commercial vessels have operated on Lake Superior. Thus, *Princeton* involved a situation in which MPCA was required to define the existing quality of protected water in order to ensure that the water quality would not be degraded by a newly permitted pollutant. *Id.* In contrast, the discharge of ballast-water pollutants into Lake Superior has always been allowed, and MPCA's permit restricts these discharges for the first time.

Also, the discharge source in *Princeton* was a single water-treatment plant, as opposed to numerous commercial vessels operating on lakes and oceanic waters. *Id.* at 98. And the discharge source was fixed and known, unlike this case where the nature of the potential pollutants (i.e., aquatic invasive species) is varied, subject to change, and possibly even unknown, given the number and types of discharge sources. Moreover, in *Princeton,* MPCA inappropriately focused on the scenic and recreational qualities of the Rum River when granting the permit instead of the need to maintain the river's existing water quality. *Id.* at 107. And MPCA erroneously set the permitting restrictions to prevent degradation below ordinary water-quality standards, rather than to preserve the existing water quality. *Id.* Here, unlike its approach in *Princeton,* MPCA appropriately focused on the need to maintain Lake Superior's existing water quality.

Under the circumstances in *Princeton—* which involved the first permitted discharge of pollutants into the Rum River, an inappropriate focus on the scenic and recreational qualities of the river instead of water quality when granting the permit, and the erroneous use of ordinary water-quality standards as a measure, rather than the existing water quality-MPCA's process for determining discharge restrictions was arbitrary and capricious. *Id.* at

95, 106–08. But the circumstances in this case are sufficiently distinguishable and unique, such that *Princeton* does not compel MPCA to establish a baseline analysis of Lake Superior's existing water quality as part of its nondegradation review in this case. Nor does *Princeton* compel us to forgo the deference that we normally afford agency decisions. In *Princeton,* our finding that deference was unnecessary was based on our conclusion that the term "existing high [water] quality" is clear and understandable. *Id.* at 108. We were not concerned with the procedure, form, and content of nondegradation review in all cases.

■■■ Having determined that *Princeton* does not dictate a particular form of nondegradation review and that MPCA's nondegradation review process is entitled to deference, we consider whether MPCA's review was otherwise arbitrary and capricious. An agency's decision is arbitrary and capricious if it represents the agency's "will, rather than its judgment." *Pope County Mothers v. Minn. Pollution Control Agency,* 594 N.W.2d 233, 236 (Minn. App.1999). Specifically, a decision is arbitrary and capricious if it (1) is based on factors that were not intended by the legislature; (2) entirely fails to address an important aspect of the problem; (3) provides explanations counter to the evidence; or (4) is so implausible that it could not be explained as a difference in view or the result of the decision maker's expertise. *Citizens Advocating Responsible Dev. v. Kandiyohi County Bd. of Comm'rs,* 713 N.W.2d 817, 832 (Minn.2006).

■■■ An "agency's conclusions are not arbitrary and capricious so long as a rational connection between the facts found and the choice made has been articulated." *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.,* 624 N.W.2d 264, 277 (Minn.2001) (quotation

omitted). If there is room for two opinions on the matter, the agency's decision to accept one over another is not arbitrary and capricious. *CUP Foods, Inc. v. City of Minneapolis,* 633 N.W.2d 557, 565 (Minn. App.2001), *review denied* (Minn. Nov. 13, 2001). "[T]he burden is on [relator] to demonstrate the arbitrariness of the [agency's] action." *Country Liquors, Inc. v. City Council,* 264 N.W.2d 821, 824 (Minn.1978).

MPCA argues that

> common sense dictate[s] that by restricting currently uncontrolled discharges MPCA will not only maintain the existing high quality of [Lake Superior], it will enhance water quality. Put simply, however high the existing water quality in Lake Superior is with completely unregulated discharges of ballast water, that water quality will necessarily be maintained and improved through the imposition [of permit restrictions].

Thus, MPCA maintains that it is unnecessary to determine Lake Superior's existing water quality in order to determine the permit terms necessary to maintain that quality.

Given the deferential standard of review and the fact that ballast-water discharge into Minnesota waters of Lake Superior has previously been unrestricted, we cannot conclude that MPCA's decision to establish permit terms without a baseline analysis of Lake Superior's existing water quality was arbitrary and capricious. Nor do we conclude, as MCEA argues, that MPCA's failure to address the risks associated with "each new invasive species that has arrived over the past 24 years, or of likely future arrivals" renders its nondegradation review process arbitrary and capricious. While MCEA's suggested analysis might be prudent, under a deferential standard of review we cannot say that MPCA's nondegradation review was arbi-

trary or capricious in the absence of such analysis. MPCA's decision does not run counter to the evidence, and it is not implausible. MPCA did not improperly consider factors that were not intended by the legislature or fail to address important aspects of the problem. In sum, MCEA has not met its burden to prove that MPCA's nondegradation review process was arbitrary and capricious.

### III.

Finally, MCEA argues that the terms of the SDS general permit will not preserve Lake Superior's high water quality. Specifically, MCEA argues that MPCA fails to identify evidence of a water-quality-based rationale for rejecting more stringent performance standards than the IMO standards and for rejecting a shorter implementation timeline. MPCA counters that it reasonably concluded that it had satisfied the nondegradation rule by adopting the most stringent treatment requirements that have been developed and that will actually be achievable during the term of the permit.

The record demonstrates that MPCA chose the IMO standards after consideration of the reasonably available and pertinent data, and review of the treatment standards believed to best preserve Lake Superior's high water quality. MPCA staff evaluated the status and available performance data of 15 separate treatment systems. With regard to MCEA's preferred standards, the "California" standards, MPCA determined that because there was no evidence that those treatment standards would be technologically achievable during the term of the permit, inclusion of those standards would not guarantee greater protection for Lake Superior's existing high water quality. MPCA reasonably concluded that adopting more stringent standards, in the absence of technology to meet those standards, would "not result in meaningful protection for Minnesota's aquatic environment."

With regard to the implementation timeline, MPCA considered the following factors: (1) the need to develop technology to meet the IMO standards; (2) the need to verify the effectiveness of such technology in freshwater conditions; (3) the need to develop a maintenance system for treatment technology; and (4) the need for existing vessels to go into dry dock for installation of treatment technology. MPCA recognized that it will take time to develop the technology necessary to implement the IMO standards and additional time to implement that technology. MPCA reasoned that vessels need to go into dry dock for installation of treatment systems and that the available space for dry-dock installation is limited. MPCA established 2016 as the deadline for final implementation of the permit restrictions for existing vessels and reasonably expects that implementation will be an ongoing process prior to that deadline. Vessels constructed after January 1, 2012 must be compliant when they begin operating on Minnesota waters of Lake Superior.

In adopting water-treatment standards and a timeline for implementation of those standards, MPCA reasoned that water quality will not be maintained and improved by the adoption of treatment standards and an implementation schedule that are unachievable. MPCA's reasoning is sound. It is not our role to reweigh policy determinations that require an agency's technical knowledge or experience. *See Annandale*, 731 N.W.2d at 523. It is likewise not our role to decide among policy choices or to second-guess the reasonableness of an agency's decision, given the broad authority afforded MPCA in its development of water-quality programs. *Id.* at 524. MPCA did not err in its adoption

of water-treatment standards and a time-line for implementation of those standards.

## DECISION

MPCA correctly determined that non-degradation review was required when it issued a permit regulating ballast-water discharge into Minnesota waters of Lake Superior. The process that MPCA used to conduct its nondegradation review and to adopt permit terms is entitled to judicial deference. Because MPCA's nonde-gradation review process and the resulting permit terms are neither based on an error of law nor arbitrary or capricious, we affirm.

**Affirmed.**