# STATE OF MINNESOTA
## IN COURT OF APPEALS
### A16-0854

Minnesota Center for Environmental Advocacy,
Relator,

vs.

City of Winsted,
Respondent,

Minnesota Pollution Control Agency,
Respondent.

**Filed January 30, 2017**
**Affirmed**
**Schellhas, Judge**

Minnesota Pollution Control Agency
Permit No. MN0021571

Kathryn M. Hoffman, Elizabeth R. Lawton, Minnesota Center for Environmental Advocacy, St. Paul, Minnesota (for relator)

Francis J. Eggert, Winsted, Minnesota (for respondent City of Winsted)

Lori Swanson, Attorney General, Max H. Kieley, Ann E. Cohen, Assistant Attorneys General, St. Paul, Minnesota (for respondent Minnesota Pollution Control Agency)

Considered and decided by Schellhas, Presiding Judge; Ross, Judge; and Jesson, Judge.

## S Y L L A B U S

Because 40 C.F.R. § 122.44(d)(1)(i)-(iii) (2016) are ambiguous regarding the data that the Minnesota Pollution Control Agency must consider in determining whether activity under a permit has the reasonable potential to cause or contribute to a violation of

water-quality standards, we defer to the agency's reasonable interpretation of those regulations.

**O P I N I O N**

**SCHELLHAS**, Judge

In this certiorari appeal, relator challenges a National Pollutant Discharge Elimination System/State Disposal System (NPDES/SDS) permit that respondent Minnesota Pollution Control Agency (MPCA) issued to respondent City of Winsted (city) for its wastewater treatment plant, asserting that the MPCA failed to comply with the requirements of the federal Clean Water Act (CWA) in issuing the permit. We affirm.

**FACTS**

Based on its authority to adopt water-quality standards under the CWA and state statutes, the MPCA adopted river eutrophication standards (RES) in 2014. Eutrophication is a response to increased phosphorus loading that "is characterized by increased growth and abundance of algae and other aquatic plants, reduced water transparency, reduction or loss of dissolved oxygen, and other chemical and biological changes." Minn. R. 7050.0150, supb. 4(G) (2015). The RES are designed to protect Minnesota rivers and streams from excess algae, which can have negative impacts on aquatic life, drinking water, and water-based recreation. Although increased levels of phosphorus can cause eutrophication, they do not always do so. Because of this, the RES are not violated unless both an exceedance of the "cause criterion" (total phosphorus or TP) and at least one of the following five "response criteria" exist: chlorophyll-a (seston) (Chl-a); five-day biochemical oxygen

2

demand ($BOD_5$), diel dissolved oxygen flux, and pH levels. *See* Minn. R. 7050.0222, subp. 4b (2015).

Among other purposes, water-quality standards like the RES are used to set limits in NPDES permits, which MPCA is authorized to issue under the CWA. On April 22, 2016, the MPCA issued an NPDES/SDS permit to the city for an existing wastewater treatment facility (facility), which discharges within the South Fork of the Crow River (South Fork) watershed. The permit requires the facility to upgrade facility technology and to move its discharge point from South Lake, which has a severe eutrophication impairment, to a new discharge location by the expiration of the permit on March 31, 2021.

The permit authorizes a new discharge location to an unnamed creek that flows into Crane Creek and then into the South Fork. Specifically, discharge from the facility will flow through six reaches of water: (1) an unnamed creek (AUID '999);[1] (2) Crane Creek (first reach) (AUID '646); (3) Crane Creek (second reach) (AUID '647); (4) Crane Creek (third reach) (AUID '524); (5) South Fork (first reach) (AUID '512); and (6) South Fork (second reach) (AUID '508). The discharge path from the new location joins the existing drainage path at the third reach of Crane Creek (AUID '524). Therefore, although technically designated as a new discharger under the CWA, the new discharge location will impact the same watershed and several of the same river reaches as the current discharge

---

[1] Reaches are identified in the permit by aquatic unit identification code (AUID); each code at issue in this appeal begins with 07010205 followed by a hyphen and a three-digit suffix. For ease of reference, we use only the three-digit suffix.

location, but will not discharge into South Lake, thereby preventing further eutrophication impairment in that lake.

Before issuing the permit, the MPCA conducted a "reasonable potential" analysis under the CWA to investigate whether the discharge would cause a violation of any applicable water-quality standards, including the RES. The MPCA concluded that a water-quality-based effluent limit (WQBEL) was necessary to protect the South Fork and set a monthly average concentration limit for phosphorus of 630 micrograms per liter ($\mu$g/L).[2]

Before issuing the permit, the MPCA gave public notice of its intent to do so, and received comments from relator Minnesota Center for Environmental Advocacy (MCEA). The MCEA expressed a number of concerns, including two that it raises in this appeal. As relevant here, the MCEA first asserted that the MPCA had insufficient data to determine whether a WQBEL was necessary for the first five river reaches impacted by the proposed relocation. In a response to the MCEA's comments, the MPCA explained that "[t]he South Fork of the Crow River was used as the point for determining the effluent limit for the facility because it was the first reach that had sufficient cause (TP) and response (Chl-a) variable data. Data are not available at every intervening reach; however, scientific information has shown that the likelihood of seeing an algae response is minimal." The MPCA explained that the first two reaches of the Crane Creek are Class 7 waters, which are not subject to the RES. And the MPCA noted that, although the limit was derived from

---

[2] The permit also sets a WQBEL in the form of a mass limit of 1,133 kilograms per year (12-month moving total) designed to protect Lake Pepin. This WQBEL is not at issue in this appeal.

data on the second reach of the South Fork, "river TP loading will be reduced in other . . . reaches including the [first reach of the] South Fork of the Crow River (AUID 07010205-512), and [the third reach of] Crane Creek (AUID 07010205-524). Limits set to protect downstream waters will also benefit intermediate waters."

The MCEA's second assertion relevant to this appeal was that the MPCA had erred in estimating the background concentration of phosphorus in the South Fork to be 75 µg/L. In its response to this comment, the MPCA explained that "[b]ackground, in this context, is a term used to define the condition of a waterbody without point source inputs" and that "[d]ata in the South Fork of the Crow River were used to characterize the existing river condition and determine the reductions necessary to meet standards." The MPCA further explained that a generally applicable formula that subtracts known point-source contributions from the river's total phosphorus loading had resulted in a negative number, meaning that "[u]nder moderate low flow conditions, more phosphorus is being discharged into the watershed than is leaving the watershed." According to the MPCA, "[t]his pattern is not uncommon in watersheds, and the data provide evidence of nutrient losses through transport due to uptake by plants, algae, and deposition into sediments." Because the "[u]se of a negative number when determining assimilative capacity of a waterbody would not provide sufficient protection," the MPCA used "half of the water quality criterion [(75 µg/L)]" as a background concentration, based on its familiarity with background concentrations in other Minnesota rivers.

Following the MPCA's issuance of the permit to the city, the MCEA filed this certiorari appeal.

5

**ISSUES**

I.      Is the MPCA's interpretation of 40 C.F.R. § 122.44(d)(1)(i)-(iii) entitled to deference?

II.      Is the MPCA's estimation of the background phosphorus concentration in the South Fork of the Crow River supported by substantial evidence?

**ANALYSIS**

The MPCA is the state agency charged with administering and enforcing the CWA. Minn. Stat. § 115.03, subds. 1, 5 (2016); 40 C.F.R. § 123.25(a) (2016). The CWA's purpose "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *In re Cities of Annandale & Maple Lake NPDES/SDS Permit Issuance*, 731 N.W.2d 502, 509 (Minn. 2007) (*Annandale*) (quoting 33 U.S.C. § 1251(a) (2000) (quotation marks omitted)). As part of its responsibilities under the CWA, the MPCA adopts water-quality standards for Minnesota waters, including the RES adopted in 2014. *See* 33 U.S.C. § 1313(c) (2012); Minn. Stat. § 115.03, subds. 1(c), 1(e), 5; Minn. R. 7050.0222, subp. 4b. Water-quality standards "generally establish the desired condition of a waterway." *In re Alexandria Lake Area Sanitary Dist. NPDES/SDS Permit No. MN0040738*, 763 N.W.2d 303, 309 (Minn. 2009) (*Alexandria Lake*) (citing 33 U.S.C. § 1313 (2006)).

Water-quality standards are used to determine whether waters are "impaired" within the meaning of the CWA. *See* 33 U.S.C. § 1313(d)(1)(A) (2012) (requiring states to list impaired waters). For impaired waters, the MPCA is required to establish total maximum daily loads (TMDLs) of particular pollutants. *See* 33 U.S.C. § 1313(d)(1)(C) (2012). Water-quality standards are also used, in conjunction with TMDLs, to determine

appropriate limits of particular pollutants to be included in NPDES permits, which the MPCA is authorized to issue under the CWA and state law. 33 U.S.C. § 1342(b)(1) (2012); Minn. Stat. § 115.03, subds. 1(e), 5. For new sources, an NPDES permit may not be issued "if the discharge from its construction or operation will cause or contribute to a violation of water quality standards." 40 C.F.R. § 122.4(i) (2016). Therefore, if the MPCA determines that a discharge has "the reasonable potential to cause, or contribute to an excursion above any State water quality standard," it must include a WQBEL in an NPDES permit. 40 C.F.R. § 122.44(d)(1)(i).

Any person aggrieved by the MPCA's final decision to issue a permit may seek review in this court pursuant to sections 14.63 to 14.69 of the Minnesota Administrative Procedure Act (MAPA). Minn. Stat. § 115.05, subd. 11(1) (2016). Under MAPA, we may affirm, remand, reverse, or modify any agency decision that is arbitrary or capricious or affected by error of law. Minn. Stat. § 14.69(d), (f) (2016). Agency decisions are presumed to be correct, and we accord deference to an agency in its field of expertise. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn. 1977).

## I.

The MCEA first asserts that the MPCA violated 40 C.F.R. § 122.44(d)(1)(i)-(iii) by failing to determine whether there was a reasonable potential for the facility, operating under the permit, to cause or contribute to a violation or exceedance of water-quality standards in the first five river reaches that would be impacted by the relocated discharge. The MPCA responds that it conducted the reasonable-potential analysis required by the federal regulations on a reach-by-reach basis; that, although limited data were available for

7

some affected river reaches, it concluded based on available data that no reasonable potential for water-quality standards to be exceeded existed in those reaches; and that the MCEA wrongly interprets the regulations to require the MPCA to assume that a water body exceeds eutrophication water-quality standards when insufficient information is available to make that determination.

As a threshold matter, the parties disagree on the standard of review and level of deference to be afforded to the MPCA in applying the federal regulations. Our supreme court addressed this issue in *Annandale*, holding that, although courts apply a de novo standard of review to the interpretation of statutes and regulations, a state agency is entitled to deference in its interpretation of a federal regulation that it is charged with administering if the regulation is "unclear or susceptible to different reasonable interpretations, i.e. ambiguous" and the agency's interpretation is reasonable. 731 N.W.2d at 515. The supreme court noted that deference is particularly appropriate when "the MPCA's training and expertise [are] necessary to interpret and apply the statute." *Id.* at 514 (emphasis omitted).

The regulations at issue here—40 C.F.R. § 122.44(d)(1)(i)-(iii)—require the MPCA to include WQBELS in a permit when the MPCA determines that activity under the permit will cause an exceedance of water-quality standards. More specifically, 40 C.F.R. § 122.44(d)(1)(i) provides that an NPDES permit shall include limitations to control "all pollutants . . . which the [MPCA] determines are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard, including State narrative criteria for water quality." Additionally, 40 C.F.R. § 122.44(d)(1)(ii) provides that, when conducting the reasonable-

8

potential analysis, the MPCA "shall use procedures which account for existing controls on point and nonpoint sources of pollution, the variability of the pollutant or pollutant parameter in the effluent, the sensitivity of the species to toxicity testing . . . , and where appropriate, the dilution of the effluent in the receiving water." And 40 C.F.R. § 122.44(d)(1)(iii) provides that "[w]hen the [MPCA] determines . . . that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above the allowable ambient concentration of a State numeric criteria within a State water quality standard for an individual pollutant, the permit must contain effluent limits for that pollutant."

Although the language of the regulations at issue plainly requires the MPCA to conduct a reasonable-potential analysis and include effluent limits under some circumstances, the language does not address the data on which the reasonable-potential analysis must be based. "When a statute or regulation is silent on a precise issue, that silence may be evidence of ambiguity." *Alexandria Lake*, 763 N.W.2d at 311. In this case, we conclude that the silence in the federal regulations regarding the data on which a reasonable-potential analysis must be based constitutes an ambiguity warranting our deference to the MPCA's interpretation and application of those regulations, so long as reasonable. *See Annandale*, 731 N.W.2d at 524 (explaining that phrase "cause or contribute to the violation of water quality standards" is ambiguous and "leaves leeway for the MPCA to make a range of policy judgments based on the MPCA's scientific and technical knowledge"); *In re Request for Issuance of SDS Gen. Permit MNG300000*, 769 N.W.2d 312, 321 (Minn. App. 2009) (reasoning that the failure of a rule to "provide direction

9

regarding the procedure, form, and content of a nondegradation review results in ambiguity," and because the rule "is ambiguous regarding the procedure, form, and content of a nondegradation review, MPCA's implementation of the rule is entitled to deference").

The MPCA interprets 40 C.F.R. § 122.44(d)(1)(i)-(iii) "as not requiring the agency to assume a water body violates eutrophication water quality standards if insufficient information is available to make this determination." The MPCA obtains data on phosphorus and response-criteria levels through a monitoring program that collects data over multiple summers; complete data is not available for all river reaches. In the absence of complete, reliable data for some of the reaches at issue here, the MPCA considered other available information to determine whether there was a reasonable potential for exceedance of water-quality standards. For instance, the MPCA concluded that algae were unlikely to grow in the unnamed creek based on scientific evidence that algae do not grow in headwater streams draining less than 50 square kilometers. For the second reach of Crane Creek, where phosphorus levels exceed the applicable standard but there are no data on response criteria, the MPCA concluded that there was no reasonable potential for exceedance of water-quality standards but recommended monitoring and modification of permit requirements if subsequently available data indicate a reasonable potential for violation of water-quality standards. *See* Minn. Stat. § 115.03, subd. 1(e). Applying the *Annandale* standard, we conclude that the MPCA's interpretation and application of 40 C.F.R. § 122.44(d)(1)(i)-(iii) is reasonable and entitled to deference.

The MCEA argues that, in the absence of complete data for all reaches that will be affected by the facility, the MPCA was required to gather that data and was precluded from

10

issuing an NPDES permit until it did so. We reject this argument as reflecting an unreasonable interpretation of the CWA and federal regulations. As the MPCA explains, it issues NPDES permits every five years and "does not wait indefinitely for perfect data, but instead makes its best judgment based on the data . . . available and requires monitoring to confirm its conclusion or to provide the basis for a permit amendment." *See, e.g., Upper Blackstone Water Pollution Abatement Dist. v. U.S. EPA*, 690 F.3d 9, 22 (1st Cir. 2012) (noting that "neither the CWA nor EPA regulations permit the EPA to delay issuance of a new permit indefinitely until better science can be developed, even where there is some uncertainty in the existing data").

**II.**

Secondly, the MCEA asserts that substantial evidence does not support the MPCA's estimation of the background concentration of phosphorus in the South Fork to be 75 µg/L. Substantial evidence is "(1) such relevant evidence as a reasonable person might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than some evidence; (4) more than any evidence; or (5) the evidence considered in its entirety." *Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 466 (Minn. 2002).

The MPCA explained in response to the MCEA's comments on the permit that the second reach of the South Fork "is downstream of several wastewater treatment plants; therefore, the monitored flow, concentration, and load of TP in this reach can be attributed to both point sources and nonpoint sources." The MPCA also explained that "[i]n order to figure out the river characteristics without point sources, (i.e. background) one can subtract

11

out the known point source contributions." But, as the MPCA further explained, that subtraction resulted in a negative number, meaning that, "[u]nder moderate low flow conditions, more phosphorus is being discharged into the watershed than is leaving the watershed." Because the subtraction formula yielded a negative number, the MPCA applied an MPCA procedure for implementing RES in NPDES facility permits to estimate the background concentration as 75 μg/L. The MPCA noted that "[t]hroughout the state it is not unusual to see phosphorus concentrations at approximately half of the phosphorus criterion during low flow conditions, especially in watersheds that are not point source dominated." The MPCA also notes that the estimated background concentration applied is consistent with an 80 μg/L background concentration that the MPCA was able to measure in the North Fork of the Crow River, which is downstream of the South Fork. This is substantial evidence supporting the MPCA's use of a 75 μg/L background concentration for the South Fork of the Crow River in calculating the WQBEL in the permit.

## DECISION

We defer to the MPCA's reasonable interpretation and application of 40 C.F.R. § 122.4(d)(1)(i)-(iii) to not require the agency to assume that water-quality standards will be exceeded in the absence of sufficient data to make that determination. And we conclude that the estimation of background phosphorus concentration in the South Fork is supported by substantial evidence. Accordingly, we affirm the MPCA's decision to issue the permit.

**Affirmed.**

12